Warren E. Gluck
Jacqueline M. Moody
Alex M. Englander (*pro hac vice forthcoming*)
Gluck & Co. LLP
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (212) 897-5887
warren.gluck@gluckllp.com
jacqueline.moody@gluckllp.com
alex.englander@gluckllp.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LALEMANT N.V.<br><br>For an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding. | Civil Action No. 26-mc-00476 |

**APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

Applicant Lalemant N.V. ("**Lalemant**" or "**Applicant**"), by and through its undersigned counsel, Gluck & Co. LLP, submits this application for an Order pursuant to 28 U.S.C. § 1782 (the "**Application**") to obtain discovery, in the form of subpoenas to be served on banking and financial institutions found within the Southern District of New York, for use in reasonably contemplated foreign proceedings in Belgium. This Application is supported by the contemporaneously filed Declaration of Warren E. Gluck, dated September 28, 2026 (the "**Gluck Decl.**"), the Declaration of Alexandre Hublet, dated September 25, 2026 (the "**Hublet Decl.**"), the Declaration of Arthur Seynaeve, dated September 25, 2026 (the "**Seynaeve Decl.**"), as well as the exhibits thereto, and a Memorandum of Law. Specifically, Lalemant seeks to obtain relevant documents in the possession, custody and/or control of Citibank, N.A.; The Bank of New York Mellon; Bank of America, N.A.; BNP Paribas USA; Commerzbank AG, New York Branch;

Deutsche Bank Trust Co. Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; Société Générale, New York Branch; Standard Chartered Bank USA; UBS AG; Wells Fargo Bank, N.A.; and The Clearing House Payments Company L.L.C. (the "**Respondents**").

It is apparent that a serious insolvency is emerging within a European industrial and infrastructure enterprise. The numbers are concerning and they contain serious omissions. Applicant is planning a range of related litigations against culpable officers, directors, shareholders, permanent representatives of directors, and transferees, and evidence located in this district will be accepted by the Belgian Courts and materially aid these legal proceedings that increasingly appear inevitable. This Application satisfies the three statutory requirements of Section 1782. First, Lalemant is an interested person: it will assert claims relating to the negligence or intentional misconduct by the board and representatives of Cometsambre S.A. ("**Cometsambre**"), relating to improper dividends, a restructuring that seems to be proceeding in the absence of a major liability being reported, insolvent trading, as well as claims against Cometsambre itself. Second, the Respondents are global correspondent banks and clearing houses that "reside" or are "found" in this judicial district, and process the relevant USD wire transfers in this district. Third, Lalemant seeks the requested discovery for use in to-be-filed foreign proceedings in Belgium (the "**Belgian Proceedings**"). *See generally Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004). Similarly, each of the four discretionary factors established by the Supreme Court also weighs in favor of awarding the requested discovery. *First*, the Respondents are not parties to the Belgian Proceedings. *Second*, the Belgian Court will accept and consider the requested document discovery. *Third*, the requested discovery does not otherwise circumvent any proof-gathering restrictions under Belgian law. *Fourth*, the requested discovery is not unduly burdensome because the Application is limited in scope to a specific number of

Discovery Targets, seeks banking records over a defined period of time, and the relevant Respondents have responded without undue expense or delay to hundreds of similar applications since the undersigned first implemented similar intermediary bank discovery processes more than a decade ago. The documents are easily accessible to, held by, created by, and relate to transactions handled or executed by Respondents in New York City.

## JURISDICTION, PARTIES & VENUE

1. Jurisdiction is proper before this Court pursuant to Title 28, United States Code, Section 1782, as the Application is for discovery involving documents located within the Southern District of New York, and this discovery is necessary to assist Lalemant in its reasonably contemplated foreign court proceedings.

2. Lalemant is a company registered under the laws of Belgium with a registered address of Ottergemsesteenweg 417 - 9000 Ghent, Belgium.

3. Cometsambre is a company registered under the laws of Belgium with a registered address of 25 Rivage de Boubier, 6200 Châtelet, Belgium.

4. Compagnie Belge de Participations Industrielles et Immobilières S.A. ("**CBPII**") is a company registered under the laws of Belgium with a registered address of Rivage de Boubier 25, Châtelet, 6200, BE-WBR, Belgium.

5. Comet Traitements S.A. ("**Comet Traitements**") is a company registered under the laws of Belgium with a registered address of 25 Rivage de Boubier, 6200 Châtelet, Belgium.

6. Comet France SAS ("**Comet France**") is a company registered under the laws of France with a registered address of 23 Route Des Gorres, 94380 Bonneuil-Sur-Marne, France.

7. Comet Fluvial SRL ("**Comet Fluvial**") is a company registered under the laws of Belgium with a registered address of 25 Rivage de Boubier, 6200 Châtelet, Belgium.

8. Comet Group Holding SRL ("**CGH**") is a company registered under the laws of Belgium with a registered address of 25 Rivage de Boubier, 6200 Châtelet, Belgium.

9. Covanord SAS is a company registered under the laws of France with a registered address of 134 Rue Felix Faure, 59350 Saint-Andre-Lez-Lille, France.

10. Ecofer S.A. is a company registered under the laws of Belgium with a registered address of 30 Rue Lefebvre-Caters(TOU), 7500 Tournai, Belgium.

11. La Barrière S.A. is a company registered under the laws of France with a registered address of 134 Rue Felix Faure, 59350 Saint-Andre-Lez-Lille, France.

12. Philippe Grosjean is a natural person, *sui juris,* and upon information and belief resides in Belgium. Philippe Grosjean is the permanent representative of CBPII, which is a director of Cometsambre.

13. Aurore Grosjean is a natural person, *sui juris,* and upon information and belief resides in Belgium. Aurore Grosjean is an administrator of Cometsambre.

14. Charlotte Grosjean is a natural person, *sui juris,* and upon information and belief resides in Belgium. Charlotte Grosjean is an administrator of CBPII.

15. Bernard Beyne is a natural person, *sui juris,* and upon information and belief resides in Belgium. Bernard Beyne was an administrator of Cometsambre during the relevant time.

16. Joel Blavier is a natural person, *sui juris,* and upon information and belief resides in Belgium. Joel Blavier is an administrator of Cometsambre.

17. Maxime Grosjean is a natural person, *sui juris,* and upon information and belief resides in Belgium. Maxime Grosjean is an administrator of Cometsambre.

18. Pierre-François Bareel is a natural person, *sui juris,* and upon information and belief resides in Belgium. Pierre-François Bareel is an administrator of Cometsambre.

19. Venue in the Southern District of New York is appropriate pursuant to Title 28 of the United States Code, Section 1782, because the discovery being sought is from global correspondent banks and clearing houses that "reside" or are "found" in this judicial district and the documentary evidence being sought is presently in the jurisdiction and in the possession, custody, and/or control of the Respondents. Moreover, the physical acts of processing the relevant wire transactions and the records themselves occurred and are in this district, such that there is in any event, specific jurisdiction with respect to all documents requested.

20. This Court has personal jurisdiction over the Respondents, who either maintain headquarters or clearing centers for U.S. dollar-denominated transactions in New York City, as explained in greater detail in the Gluck Declaration, with offices at the following addresses:

- **a.** The Clearing House Payments Company, L.L.C. maintains headquarters at 1114 Avenue of The Americas, 17th Floor, New York, NY 10036;
- **b.** Citibank, N.A. maintains its global headquarters at 388 Greenwich Street, New York, NY 10013;
- **c.** The Bank of New York Mellon maintains its headquarters at 240 Greenwich Street, New York, NY 10286;
- **d.** Bank of America, N.A. operates from its Bank of America Tower at One Bryant Park, New York, NY 10036;
- **e.** BNP Paribas New York Branch maintains its regional headquarters at 787 7th Avenue, New York, NY 10019;
- **f.** Commerzbank AG, New York Branch is a branch of a German bank which provides U.S. clearing services in the United States and is located at 225 Liberty Street, New York, NY 10281;
- **g.** Deutsche Bank Trust Company Americas maintains headquarters at 1 Columbus Circle, New York, NY 10019;
- **h.** HSBC Bank USA, N.A. maintains headquarters at 66 Hudson Blvd. E, New York, NY 10001;
- **i.** JPMorgan Chase Bank, N.A. maintains its corporate headquarters at 270 Park Avenue, New York, NY 10017;
- **j.** Société Générale, New York Branch is a French bank and maintains its head U.S. office at 245 Park Avenue, New York, NY 10167;

**k.** Standard Chartered Bank, New York Branch is a branch of a major English bank that maintains its headquarters at 3 Bryant Park, New York, NY 10036;

**l.** UBS AG conducts its U.S. operations primarily from 1285 Avenue of the Americas, New York, NY 10019; and

**m.** Wells Fargo Bank, N.A. operates at 30 Hudson Yards, New York, NY 10001.

## RELEVANT FACTS

### I. The Comet Group Structure

21. Cometsambre is a Belgian company engaged in ferrous metal recycling and trading. *See* Seynaeve Decl. ¶ 8.

22. Cometsambre operates shredding sites for scrap metal. *See* Seynaeve Decl. ¶ 9.

23. Comet Traitements is a sister company of Cometsambre, and it is engaged in post-shredder metal treatment and recycling. *See* Seynaeve Decl. ¶ 10.

24. Cometsambre owns 100% interests in Comet Fluvial SRL and Comet France SAS. Cometsambre also owns interests in various other companies, such as Ecofer SA, Covanord SAS, Terecoval SAS, and La Barriere SCI. The aforementioned companies operate under the trade title "**Comet Group**" or "**Groupe Comet**." *See* Seynaeve Decl. ¶ 11.

25. As of December 31, 2025, CBPII owned 85%+ of Comet Traitements and Cometsambre. CBPII was also the 100% owner of various other companies. *See* Seynaeve Decl. ¶ 12.

26. The ultimate beneficial owners of CBPII, as of October 13, 2022, included Maxime Grosjean, Guillaume Grosjean, Aurore Grosjean, Charlotte Grosjean, Juliette Grosjean, and Philippe Grosjean (the "**UBOs**"). *See* Seynaeve Decl. ¶ 13.

27. The governance of the Comet Group is concentrated amongst the UBOs, principally Philippe Grosjean and members of his family. *See* Seynaeve Decl. ¶ 14.

28. Philippe Grosjean serves as Managing Director of CBPII and is a permanent representative of CBPII on the boards of Cometsambre, Comet Traitements, and CGH (discussed, *infra*); he also serves as president of Ecofer. *See* Seynaeve Decl. ¶ 15.

## II. The Lowlands Mimosa Incident

29. Cometsambre and Lalemant were parties to a transportation agreement (the "**Agreement**"). *See* Seynaeve Decl. ¶ 4.

30. Lalemant also acted as the vessel Lowlands Mimosa's agent. *See* Seynaeve Decl. ¶ 5.

31. On or about June 22-23, 2022, two fires broke out onboard the Lowlands Mimosa while Cometsambre scrap metal was being loaded in Ghent, Belgium (the "**Lowlands Fire**"). The fires caused significant damage exceeding $30,000,000 (the "**Claim**"). *See* Seynaeve Decl. ¶ 6.

32. The cause of the fire related to Cometsambre's inclusion of unreasonably high levels of impurities in its metal, and it was not the first time it experienced such an issue. *See* Seynaeve Decl. ¶ 7.

33. Cometsambre is liable to Lalemant for the Claim pursuant to the Agreement. Lalemant commenced arbitration in London and awaits an award. *See* Seynaeve Decl. ¶ 6.

## III. Corporate Malfeasance Following the Lowlands Fire

34. The Lowlands Fire gave rise to the significant and largely indefensible Claim exceeding $30 million (*see* Seynaeve Decl. ¶ 16) and placed the Comet Group and the directors of Cometsambre on notice of substantial liability.

35. With knowledge of that pending Claim, the Comet Group and directors of Cometsambre thereafter engaged in numerous unlawful actions, leaving the company, based upon

its own records, undercapitalized, balance sheet insolvent in virtually any enforcement scenario by its multiple creditors—including Applicant—and unable to satisfy its debts.

36. On April 21, 2022, at a time where Cometsambre was insufficiently insured (discussed below), Cometsambre repurchased $8,680,000[1] of its own shares from the Société Fédérale de Participations et d'Investissement SA and SRIW Environnement SA, both public investors, leaving a comparable unavailable reserve on its balance sheet.[2] *See* Seynaeve Decl. ¶ 17.

37. Cometsambre has never recorded a provision or holdback for the Claim in any of its accounts for fiscal years 2022 through 2025, despite litigation and arbitration ongoing. Moreover, during 2023, the only provision on Cometsambre's books—a $537,000 provision for financial risks—was released in its entirety. *See* Seynaeve Decl. ¶¶ 18-19.

38. In fiscal year 2022, Cometsambre approved a $5,450,000 dividend, despite describing London arbitration in its management report as "vraisemblable" (likely) with financial consequences impossible to predict. *See* Seynaeve Decl. ¶ 20.

39. In fiscal year 2023, Cometsambre paid its shareholders $5,725,000 in dividends. It closed the following fiscal year with a loss of $660,000. *See* Seynaeve Decl. ¶ 21.

40. These two post-fire dividends together were over 5.1 times the <u>*combined*</u> profit of the years in respect of which they were paid. The post-fire dividends largely came from accumulated reserves, not from current earnings. Combined with the $8,680,000 paid to exiting shareholders in April 2022, approximately $19.9 million left the company between FY2022-FY2024, and no provision was ever recorded in any year for the Claim.

---

[1] Cometsambre reports its annual financials in Euros, regardless of whether it conducts business in United States Dollars. Numbers referenced herein have been converted to dollars uniformly at the relevant prevailing conversion rate.

[2] This repurchase occurred two months before the Lowlands Fire.

41. Cometsambre did not issue any dividends for the 5 years preceding the Lowlands Mimosa fire. *See* Seynaeve Decl. ¶ 22. On information and belief, the dividends that followed the fire were issued with the intent to avoid creditors.

42. Matters have recently become more dire. On July 21, 2026, the High Court of England delivered a judgment in favor of Lloyd's of London and against Cometsambre (the "**Lloyd's Judgment**"), holding that Lloyd's properly avoided its contract for coverage relating to the Lowlands Fire on the ground that Cometsambre had failed to disclose prior fires that in general arose from the same cause. *See* Seynaeve Decl. ¶ 24.

43. Consequently, all recoveries on Cometsambre's debts, including those related to the Lowlands Fire, must come from Cometsambre's own balance sheet via the litigations, insolvencies and actions directed at group-related assets that are the subject of this Application.

44. On July 16, 2026, just five days before the Lloyd's Judgment, the UBOs formed Comet Group Holding SRL in Belgium. *See* Seynaeve Decl. ¶ 25.

45. According to Comet Group Holding SRL's Statutory Auditor's Report to the Founders dated June 18, 2026 (the "**Auditor's Report**"), CBPII contributed approximately $135.4 million in kind of the following shares in exchange for 117,666,750 shares (87.05%) of Comet Group Holding SRL:

**a.** 1,820 shares of Cometsambre, representing 85.93% of the shares issued by that company;

**b.** 1,000 shares of Comet Traitements, representing 85.47% of the shares issued by that company;

**c.** 62 shares of Comet Tyre Recycling, representing all of the shares issued by that company.

*See* Seynaeve Decl. ¶ 26.

46. The Auditor's Report **"does not involve expressing an opinion on the appropriateness or advisability of the transaction, including the valuation of the consideration granted in return for the contribution, nor on the legitimacy and fairness of this transaction."** (emphasis added).

47. The Auditor's Report indicates that Comet Group Holding SRL's object is to purchase and sell securities, real estate, and group support services. Further, the purpose of the company is "to enable new shareholders and investors to join the shareholder base of the 'COMET' group. The contribution of the shares issued by COMETSAMBRE SA, COMET TRAITEMENTS SA and COMET TYRE RECYCLING SA forms part of this plan and will enable the company to be formed to fulfil its role as the holding company of the 'COMET' group and, consequently, to achieve its corporate purpose." *See* Seynaeve Decl. ¶ 27.

48. Critically, the mutual veto structure of CGH's board effectively prevents any forced sale, transfer, or realization of the contributed participations until at least July 2033, placing significant governance barriers between creditors and the group's core asset base. This is antithetical to payment of an uninsured liability and appears to be the product of a liability management exercise that ultimately represents the subject of this investigation. In this regard, nothing is more crucial than obtaining the raw banking and cash flows of the Cometsambre group, which appear to be largely or entirely in U.S. dollars. Similarly, the discovery is anticipated to reveal the location and routing method of the unlawful dividends and core participants in the liability management exercise.

49. Comet Group Holding SRL's Board of Directors is constituted as follows:

**a.** CBPII SA (permanent representative Philippe Grosjean) serves as Chair and Administrateur A, nominated by the majority shareholder, holding 87.05%. Additional Administrateur A seats are held by Aurore Grosjean, Charlotte Grosjean, and Maxime Grosjean.

**b.** SFPIM SA (permanent representative François Fontaine) holds an Administrateur B seat. Sparaxis SA (permanent representative Olivier Bouchat) holds an Administrateur B seat.

**c.** Pierre-François Bareel serves as Administrateur Délégué (Managing Director/CEO) with daily management and sole signature authority. He is also the Comet Group CEO.

*See* Seynaeve Decl. ¶ 28.

## IV. The Discovery Sought

50. Cometsambre filed its FY2025 annual accounts with the Belgian National Bank on September 9, 2026—past the statutory filing deadline of July 31, 2026. The accounts cover the fiscal year ending December 31, 2025 and were allegedly approved by the general assembly on June 2, 2026. *See* Seynaeve Decl. ¶ 29.

51. The FY2025 accounts reveal the company is in severe financial distress. Total assets contracted 28% year-over-year. Total equity declined 35%. Available cash fell 73% to just $1.87 million. *See* Seynaeve Decl. ¶ 30.

52. The income statement confirms the deterioration. Although revenue increased modestly by 3%, the operating loss widened more than twelvefold to nearly $8 million in FY2025. Financial charges surged 240% to nearly $10.4 million. The net loss for the year to be allocated was $14.5 million, compared to a loss of only $590,000 in FY2024. *See* Seynaeve Decl. ¶ 31.

53. Cometsambre has only $21,000,000 in available reserves for FY2025. *See* Seynaeve Decl. ¶ 32.

54. Critically, Cometsambre has still not recorded any provision for the Claim in its FY2025 accounts, extending the pattern of zero provisioning to a fourth consecutive year since the Lowlands Fire. The provisions for risks and charges line remain at zero, despite the Lloyd's Judgment that forecloses coverage. *See* Seynaeve Decl. ¶ 33.

55. The management report acknowledges the fire, notes that the court-appointed expert submitted his final report on February 24, 2026, and states that responsibilities "appear to be shared among several parties." *See* Seynaeve Decl. ¶ 34. The directors maintain that it is "not possible, at this time, to reliably estimate the potential financial consequences," despite the Claim having been quantified in the London arbitration and the face-slapping nature of the in-progress liability management exercise.

56. The board of directors expressly acknowledged that the balance sheet shows a loss for both the current and prior fiscal years, triggering a going concern analysis required under Article 3:6 6° of the Belgian Companies and Associations Code. The board's conclusion that going concern accounting "remains appropriate" rests on the company's asserted "ability to meet its obligations and continue its operations in the near future," but provides no detail on how a company with $1.87 million in cash and $40 million in short-term liabilities can meet an uninsured and unprovisioned Claim. *See* Seynaeve Decl. ¶ 34. Multiple and serious litigations are contemplated against multiple parties.

## V. <u>Lalemant's Claims Against Cometsambre, Its Directors, and The Comet Group</u>

57. Lalemant reasonably contemplates at least the following legal proceedings in Belgium against Cometsambre, its directors, and the Comet Group. Details forthcoming will

determine whether such claims are turned over to the public prosecutor in relation to what in continental Europe is known as a private criminal prosecution with civil damages.

**a. <u>Contemplated Avoidance Claims</u>**

58. Under Belgian law, a creditor is permitted to have declared unenforceable legal acts performed by a debtor that causes prejudice to any creditor's rights of recourse, where that act was performed with the debtor's knowledge of the resulting prejudice. This is known as an "*actio pauliana*." *See* Hublet Decl. ¶ 12.

59. The following elements are required for a successful *actio pauliana*: (i) the creditor must hold a claim against the debtor, which must in principle predate the impugned act, but which, however, need not yet be due and payable; (ii) the impugned act must cause prejudice to the creditor's rights of recourse; and (iii) the debtor must have acted with knowledge that the act would prejudice the creditor. *See* Hublet Decl. ¶ 13.

60. Upon a successful *actio pauliana*, the impugned act is declared unenforceable against the acting creditor, who may then proceed as though the relevant assets had never left the debtor's estate. *See* Hublet Decl. ¶ 15.

61. Here, Lalemant reasonably contemplates bringing an *actio pauliana* against Cometsambre and its shareholders seeking to challenge the improper 2022-2023 dividends and distributions, and recover the same in their current form having traversed the USD intermediary bank financial system.

62. The FY2022-2023 dividends exceeded $11,200,000, and were issued at a time when Cometsambre could not pay the full amount of the dividends from operating profits, and Cometsambre's board knew of the Claim and its financial consequences.

63. As Cometsambre presently does not have sufficient assets at values that result from the liquidation necessary to cover the Claim, the dividends caused significant prejudice to

Lalemant as a creditor. Moreover, the liability management exercise places severe restrictions on equity executions.

64. Lalemant further reasonably contemplates bringing an *actio pauliana* with respect to the CGH restructuring.

65. The restructuring occurred within days of the Lloyd's Judgment, which further cemented Cometsambre's significant liabilities with respect to the Claim.

66. If in the course of the restructuring, Comet Group at least with respect to all debt-related instruments caused Cometsambre to grant security interests, guarantees, or other preferential arrangements to other creditors, such acts would have significant prejudicial effects on Lalemant's rights of recourse.

**b. <u>Contemplated Claims Against Cometsambre's Directors</u>**

67. Under Belgian law, directors of a company are required to perform their duties as would a normally prudent and diligent director placed in the same circumstances. *See* Hublet Decl. ¶ 19.

68. Directors who breach this duty may incur liability towards the company and, in appropriate circumstances, toward third parties, including creditors. *See id.*

69. Belgian law recognizes that creditors may bring tort claims against a director personally where the director's conduct constitutes a breach of the duty of care and that fault caused the creditor damage. *See* Hublet Decl. ¶ 20.

70. A director's decision to approve or recommend a distribution to shareholders that the company's governing body knew or reasonably should have foreseen, would leave the company unable to meet its foreseeable liabilities, or would create or worsen a net-asset deficiency, exposes the director to personal liability. *See* Hublet Decl. ¶ 22.

71. The directors of Cometsambre are liable to Lalemant with respect to the FY2022-2023 dividends as it was wrongful to propose and distribute Cometsambre's available reserves and profits—rather than setting them aside—and to fail to claim reimbursement from shareholders for the dividends and reserves already distributed, when the company was facing a substantial Claim and had no insurance cover in respect of that Claim–a Claim that has now negatively crystallized after being litigated for years. The directors acknowledged in their management report for FY2024 that insurers are more frequently limiting their liabilities with respect to metal fires.

72. Directors who cause a company to undertake a restructuring in circumstances indicating an intent or a foreseeable effect of shielding assets from a company's creditors – such as a liability management exercise – may incur personal liability where the restructuring is closely followed in time by an adverse judgment or the crystallization of a contingent liability that was known to the directors at the time the restructuring was undertaken. *See* Hublet Decl. ¶ 25.

73. Cometsambre's directors and permanent representatives responsible for the formation of CGH are liable for, among other things, any pledging of Cometsambre's or its subsidiaries' assets relating to the restructuring.

74. Belgian law imposes on directors a duty to keep and maintain annual accounts, timely submit them for approval to the shareholders, and publish them timely. *See* Hublet Decl. ¶ 23.

75. Belgian law also requires directors ensure that these annual accounts include adequate provisions for risks and costs where warranted and give a true and fair view of the company's financial position and satisfy the requirements of prudence, sincerity, and good faith. *See id.*

76. As such, a director's failure to record a provision for a liability could constitute a breach of this duty. *See id.*

77. Where the non-establishment of that provision enabled a distribution to shareholders that would not otherwise have been permissible, it constitutes a breach of the Belgian Code of Companies and Associations (the "**BCCA**"), which is a ground for director's liability and could well lead to criminal sanctions. *See id.*

78. The breach of the BCCA may also give rise to an obligation on the part of shareholders who received the distribution to restitute it. *See* Hublet Decl. ¶ 24.

79. Further, the non-establishment of a required provision may have the effect of artificially keeping a company's reported net assets above certain statutory thresholds for operation as a going concern, which may likewise constitute grounds for director's liability, and any damage suffered by third parties is presumed to have resulted from that failure. *See id.*

80. In addition to related claims above, Cometsambre's insolvency would create additional grounds for its directors' liability. *See* Hublet Decl. ¶ 27.

81. Should Cometsambre be declared bankrupt, Belgian law requires the cessation of payment of debts on a persistent basis and loss of creditworthiness, and the directors may be held liable where it is found that their own gross faults contributed to the bankruptcy. *See id.*

82. The current action is designed to assess this concern with respect to cash-flow – not accountant-massaged "account balance information."

83. The directors may also be held liable to a bankruptcy trustee if it is found they caused Cometsambre to continue in loss-making activity in circumstances where there is no reasonable prospect of avoiding bankruptcy. *See id.*

84. Lalemant's Claim against Cometsambre provisionally amounts to over $30,000,000, being the principal sums claimed in the arbitration proceedings. Lalemant will seek as a matter of right, interest, legal costs, including arbitration costs and legal representation costs, that will result in a rough doubling of the adjudicated amount.

## VI. The Discovery Sought

85. Wire records relating to the USD cash revenues and expenses of Cometsambre S.A., the Comet Group, and the relevant defendants are highly relevant and probative to the forthcoming Belgian Proceedings. As described above, approximately $11.2 million in dividends were paid after the Lowlands Fire, even though Cometsambre had paid no dividends during the five years preceding the Lowlands Fire. These records will show the ultimate destination of these proceeds, others involved, and those behind the liability management exercise.

86. The wire records are anticipated to reveal the extent and recipients of the improper dividends issued by Cometsambre during the relevant period. They will reveal the ultimate beneficiaries of those payments and whether additional, unreported distributions occurred at the broader group level.

87. The wire records are further expected to be probative as to whether further improper and unlawful transfers of funds occurred in connection with the CGH restructuring. As described above, CBPII contributed $135.4 million in kind to CGH, and the UBOs formed CGH just five days before the Lloyd's Judgment. The records will reveal whether cash or other consideration flowed alongside the in-kind contributions and whether funds were diverted to the UBOs or other insiders. While figures in its accounts are reported in Euros, the Comet Group as a whole does business in United States denominated currency.

88. To the extent that Cometsambre or its subsidiaries pledged assets, such as accounts receivables, in relation to the restructuring, the wire records likely will reveal the same.

89. Further, to the extent Cometsambre is trading insolvently, the wire records are anticipated to demonstrate whether further unlawful transactions occurred during the relevant time. Cometsambre belatedly filed its FY2025 accounts on September 9, 2026—after the statutory deadline—revealing a net loss of $14.5 million, total equity of only $27.7 million, and a $40 million short-term credit facility from BNP Paribas Fortis. The wire records will reveal whether Cometsambre continues to meet its obligations, particularly its USD obligations, or is experiencing the persistent cessation of payments that would trigger formal bankruptcy proceedings.

90. For each of the foregoing, the wire records would demonstrate, *inter alia*, the senders, recipients, and amounts of the improper transfers. The underlying records are uniquely available from the Respondent banks and clearing houses and are not otherwise obtainable through the Belgian Proceedings. Section 1782 discovery is therefore essential to obtain this evidence for use in the Belgian Proceedings.

91. The discovery sought herein is materially important to the Belgian Proceedings. The Comet Group's systematic efforts to obscure its financial position through delayed filing, restructuring, and dividend stripping make the independent banking records held by the Respondents the only reliable means of establishing the group's true financial position.

## REQUEST FOR RELIEF

**WHEREFORE**, pursuant to 28 U.S.C. § 1782, Lalemant respectfully requests that this Court enter an Order:

A. Authorizing Lalemant to conduct limited discovery pursuant to 28 U.S.C. § 1782 and the Federal Rules of Civil Procedure in the form of production of relevant documents and information held by the Respondents, within the jurisdiction of this Court and as set forth in the Proposed Order;

B. Directing the Respondents to comply with any discovery authorized by this Court's Order in accordance with the Federal Rules of Civil Procedure and the Rules of this Court;

C. Appointing the undersigned counsel to issue appropriate subpoenas to obtain the discovery authorized by this Court's Order;

D. Providing that this Court shall retain jurisdiction over this matter as is necessary to enforce the terms of any discovery authorized by this Court's Order; and

E. Granting Lalemant such other and further relief as the Court deems just, equitable, and proper.

Dated: September 28, 2026
New York, New York

Respectfully submitted,

**GLUCK & CO. LLP**

/s/ *Warren E. Gluck*
Warren E. Gluck
Jacqueline M. Moody
Alex M. Englander (*pro hac vice forthcoming*)
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (212) 897-5887
Email: warren.gluck@gluckllp.com
jacqueline.moody@gluckllp.com
alex.englander@gluckllp.com